Welch, J.
The defendant, proceeding pro se, has filed his first motion for new trial pursuant to Massachusetts Rule of Criminal Procedure 30(b). The defendant pled guilty pursuant to a plea agreement he reached with the prosecution. He now claims he was coerced into pleading guilty and was denied his right to a trial. Ergo, he argues, justice was not done and a new trial must be ordered. The defendant was indicted for numerous counts of larceny over $250, violations of the home improvement contractors laws, and one count of larceny over $250 on a person over the age of sixty. Two co-defendants, Robert F. Newell, Jr. and Stephen M. Todd were indicted on similar charges. In essence, the defendant and his co-defendants were charged with entering into a scheme whereby they would approach individuals, often elderly, and offer to do home improvement work. After obtaining money from these individuals who relied upon their promises, the defendants would not perform the work or would perform unnecessary or grossly inadequate work.
The co-defendants elected to be represented by counsel. Defendant Scott Gaumond insisted on asserting his right to proceed pro se. Because the case involved numerous pre-trial motions, the case was specially assigned to this judge. As a result, this judge became quite knowledgeable about the allegations and the evidentiary issues. Despite cautions provided by this judge, defendant Scott Gaumond insisted on proceeding pro se. This judge appointed standby counsel to assist Mr. Gaumond.
After various trial date continuances, trial was scheduled for November 30,1999. The day before trial, the defendant, and his co-defendants, decided to plea guilty. This judge was familiar with the very extensive prior criminal records of all three co-defendants. Defendant Scott Gaumond’s prior criminal record included numerous prior fraud and larceny convictions relating to similar schemes. Without any urging by the judge, the defendants and the Commonwealth engaged in plea negotiations.
After participating in those discussions, defendant Scott Gaumond, with his standby counsel, asked to approach sidebar and discuss with the court, on the record, his concerns about the proposed sentencing recommendation that the prosecutor was willing to offer in exchange for a pretrial plea. The Commonwealth explained that it was willing to recommend a 5-to 7-year sentence of incarceration should Gaumond plead guilty to the charges. (Transcript, p. 98.) The Commonwealth stated that it was making a rather lenient sentence recommendation (in light of the numerous charges, the allegations of serious and prolonged fraudulent behavior, and the defendant’s long criminal record) due to the Commonwealth’s concerns about subjecting the victims, a number of whom were elderly, to the trauma of trial. Indeed the Commonwealth emphasized that its offer was “too generous” and the product of a “momentary lapse.” (Transcript, pp. 97, 102.) Defendant Scott Gaumond, on the other hand, wanted the court to intervene to force the Commonwealth to recommend a sentence less than 5 to 7 years of incarceration or to commit to a sentence below the Commonwealth’s recommendation. To this end defendant Gaumond asked the Court to impose a sentence of 4 to 5 years on incarceration. (Transcript, p. 100.)
In essence what was conducted at the sidebar is what is known in the Superior Court parlance as a “Lobby Conference.” This conference, however, did not occur in the lobby or off the record but instead on the record and in the courtroom. A lobby conference is often requested in many criminal cases, such as this one, where the parties disagree as to what sentence should be imposed in the event the defendant pleads guilty. The purpose of such a lobby conference then is to determine what sentence the judge will give upon a plea, i.e., will the judge accept the defendant’s recommendation or the unusually more stringent suggestion *520 of the prosecutor; and if the defendant does not plead to the Commonwealth’s recommendation, will that result in more jail time after triali.e., how much credit will the judge give for the defendant’s acceptance of responsibility. Resorting to the oft used analogy of making sausage, the process of plea negotiation in a lobby conference maybe messy and even unappealing, but the defendant is eager to engage in the process because he seeks to know the flavor of the end result. In short, the defendant is seeking as much information as possible before making an important decision.
In the present case, this judge heard from both sides on the record and then indicated that the court would impose the Commonwealth’s recommended sentence should the defendant plead guilty. When the defendant requested a lighter sentence, this judge indicated, using conditional language, that if the case was to go to trial and if the Commonwealth was to prove all of the serious charges, “I might later impose a sentence significantly higher than 5 to 7 ... if they prove the charges, these charges deserve a much stiffer sentence” than the 5 to 7 sentence offered. The defendant continued to complain about the government’s recommendation and likened it to a “life sentence.” This judge then discussed the defendant’s options:
Look, there’s no doubtl wouldn’t want to do 5 to 7. But, frankly, you have to look at your options. Maybe you have some strong defenses. Maybe you don’t get convicted of these crimes. But, if you get convicted, I think you’re talking about a sentence that’s going to be far stiffer than 5 to 7.1 think that, then, really a good chunk of your productive life will be taken away from you. Whereas 5 to 7 gets you out, back on the street.
(Page 100.) Not deterred, defendant Gaumond then again asked the Court “to consider a possibly 4 to 5.” The Court indicated to the defendant that this judge would not impose such a sentence of 4 to 5 and opined: “I think 5 to 7 is a very generous offer.” (Transcript, pp. 100-01.)
It should be noted that the defendant, while proceeding pro se, was remarkably knowledgeable and sophisticated about the workings of the criminal system and criminal sentencing options. It was the defendant himself who requested a conference to discuss the plea negotiations. (Transcript, pp. 96-97.) After the sidebar conference, the defendant was provided time to consider his options and discuss them with his standby counsel. The defendant took advantage of this opportunity. (Transcript, p. 103.) Showing his sophistication with the law, and how calm and reflective the defendant was during this period of time, the defendant stated he would accept the plea agreement but only if the sentences were imposed on “pre-truth in sentencing” charges. (Transcript, p. 103.) The Commonwealth, which had already indicated that it thought that its earlier offer of 5 to 7 was excessively lenient, refused the defendant's request that the sentence. run on earlier, pre-truth and sentencing charges. After this discussion, the defendant responded “I will accept the plea your honor.” (Transcript, p. 104.)
This judge then proceeded with the a rather extensive plea colloquy. During the course of this plea colloquy, the defendant evidenced a full understanding of the proceedings. The defendant stated that he was taking medications for certain conditions and such medications made it easier for him to mentally focus and make decisions. (Transcript, p. 112.) Earlier that day, the defendant had been examined by a court appointed psychiatrist and was found to be competent. The defendant at all times was a coherent, intelligent, and experienced participant in the plea negotiations process and during the plea colloquy. For example, the defendant used the plea colloquy to ask such questions as to whether the sentence imposed in this case could run “concurrent” to the probation he was currently serving in Suffolk County. The defendant’s stand-by counsel took an active roll in the plea colloquy. (Transcript, p. 120.) The Commonwealth acceded to the defendant’s request and recommended that the sentence be served concurrently with the Suffolk County sentence. (Transcript, pp. 121-22.) The defendant also made sure he was appropriately credited for any time held in custody on these charges. (Transcript, p. 143.)
Before the Commonwealth stated the facts upon which it would rely on trial, this judge gave a special caution to the defendant:
Now, I don’t want you to pleading guilty to anything you’re not guilty of, so please pay attention to this Assistant Attorney General. At the end, I’m going to ask you, “Mr. Gaumond, did you do those things?”
If you didn’t, don’t plead guilty. Do you understand, Mr. Gaumond?
The defendant responded in the affirmative. (Transcript, p. 123.) After giving a summary of the facts, the defendant did not agree “with some of the facts . . . with regards to my participation and the amounts refunded and charged. I think there are some serious discrepancies in the amounts; but I do agree that there is substantial facts.” Upon further inquiry, the defendant admitted that he had committed larceny. (Transcript pp. 136-37.) The defendant also agreed that he stole money from the victims by engaging in a scheme with co-defendant Newell to defraud various elderly individuals and that he repeatedly (in excess of 12 times) violated the home improvement contractor laws. The defendant stated that no one forced him to plead guilty or put pressure upon him to plead guilty. He also agreed that he pled guilty willing, freely, and voluntarily. (Transcript p. 137.) During the plea colloquy, the court informed the defendant that he was still free to go to trial. To the judge’s statement “well I am *521 happy to let you go to trial,” the defendant responded that he did not want to do that. (Transcript 138.)
Throughout the entire process of the plea negotiation and subsequent colloquy, the defendant was not emotional, distraught, confused, or upset. The defendant used the services of his stand-by counsel. The defendant evidenced a remarkable degree of legal sophistication and drove a hard bargain with the Commonwealth. There is no possible way that the defendant’s will was overborne in anyway nor was he subject to coercion.[1]
This case is further evidence that the frequent state court practice of “lobbying” cases, and thereby having judges participate in plea bargaining, should be “discouraged.” Commonwealth v. Johnson, 27 Mass. App. 746, 750 (1989). One reason why judicial participation in the plea negotiation process is disfavored is that, even though a defendant often wishes the judge to inform him of his options and seeks to have the judge pressure the Commonwealth in making a more lenient recommendation, any comment made by the judge later may be pointed to as some type of coercion which forced the defendant to give up his right to a trial.[2]
In order to succeed in this motion, the defendant must establish “by objective proof that the judge forced a guilty plea by putting the defendant on notice that he could expect more severe punishment if he insisted on a trial by jury." Commonwealth v. Damiano, 14 Mass. App. 615, 619 (1982). Such coercion may occur when a judge “unequivocally” or “straight out” tells a defendant that he will be given a definite, more severe sentence if he opts to proceed to trial instead of pleading guilty. See Commonwealth v. Carter, 50 Mass. App. 902 (2000) (coercion found when trial judge encouraged defendant to plead guilty and offered sentence of six years to six years and one day on a guilty plea but after trial gave the guarantee that the sentence would be eighteen to twenty); Commonwealth v. Lebon, 37 Mass. App. 705, 706 (1994) (trial judge coerced forfeiture of right to jury trial when he promised not to impose a committed jail sentence if the defendant opted for a jury-waived trial, but promised to impose a period of incarceration should the defendant demand a jury). These unusual cases stand in contrast to the traditional situations where the trial judge does not commit himself in advance to the imposition of a particular sentence but instead discusses various sentencing alternatives and explains the options to a defendant. Commonwealth v. Carter, supra at 904 (comparing and distinguishing the case of Commonwealth v. Damiano, 14 Mass. App. 615, 620 (1982)).
The present case falls well within the non-coercive plea bargaining situation upheld in Commonwealth v. Damiano, supra.. This is a determination that must be made on a case by case basis. One begins the analysis with two somewhat opposing concerns. There is no doubt that any defendant involved in a plea negotiation prior to trial is under “a certain degree of coercion (in the sense of physiological or emotional pressure)” in that entering a plea requires “a person to forgo certain rights in order to be spared certain penalties.” Commonwealth v. Damiano, supra at 619. In the context of a plea negotiation, the sentencing judge may “reward” a defendant with a lighter sentence in that the “admission of guilt is a socially positive act” and, particularly in the context of this case, such an admission spared elderly victims the trauma of testifying at trial. Commonwealth v. Lebon, 37 Mass. App. 705, 707 (1994). See also Commonwealth v. Johnson, 27 Mass. App. 746, 750-51 (1989). The Supreme Judicial Court has recognized the reality of plea negotiation and held: “The possibility that a greater penalty will result from a jury trial than from the entry of a guilty plea has not been found to infringe impermissibly on the right to a jury trial.” Commonwealth v. LeRoy, 376 Mass. 243, 246 (1978). So it is in this case.
Facts to be considered include the fact that the trial judge did not attempt to force a plea upon the defendant. In this case, the judge reiterated in the plea colloquy that he would be happy to have the defendant go to trial. More telling, it was the defendant himself (knowing that he had the right to his jury trial on the very next day) who asked to conference the case with the judge. Any suggestion in the nearly identical affidavits filed by the three co-defendants in support of this motion that this judge somehow pressured the co-defendants into pleading guilty by threatening, through their attorneys, “double digit” sentences after trial is ludicrous and completely unsupported. As can be seen from the transcript of the lobby conference and the plea colloquy, the defendant was knowledgeable and experienced with the criminal justice system. The defendant used the services of stand-by counsel and repeatedly sought to obtain the best deal that he could in a sentence. First he requested that the judge impose a sentence lower than the Commonwealth’s recommendation. Then the defendant suggested that the sentence run on the pre-truth in sentencing counts. Finally the defendant won the concession to have his Suffolk County probation (and any sentence imposed on a probation violation) run concurrently with the sentence being imposed in Essex County. The record of these proceedings (which covers forty-seven transcript pages) plainly establishes the defendant’s “awareness of the situation, legal distinctions, and available options.” Commonwealth v. Damiano, supra at 621.
This judge does not rely solely upon the record that has been transcribed. As the judge specially assigned to this case, I fully recall Mr. Gaumond’s behavior during this time. He was at all times cool and collected and in command of the legal situation. Earlier in the proceedings, the Assistant Attorney General had stated that she would be seeking a veiy lengthy prison sentence if the defendants were found guilty. She *522 explained that she might seek a sentence enhancement due to the extensive prior criminal record of the defendant Gaumond. Mr. Gaumond had engaged in extensive discovery and was aware of the numerous witnesses who would testify against him at the trial. Mr. Gaumond was aware that the trial date was a certainty and that various of his co-defendants already had pled guilty. Confronted with these realities, the defendant was actively seeking the best deal that he could make. In this attempt, he sought the judge's assistance by asking for a lobby conference to discuss the Commonwealth’s sentencing recommendation.
The side bar conference began with this judge asking the Commonwealth for its sentencing recommendation. The Assistant Attorney General stated that she would honor a sentence of five to seven years (plus probation on and after) even though she believed that it was a “momentary lapse,” in that it was too lenient of a sentence. The judge then simply asked the defendant “Mr. Gaumond, what do you think about that?” (Transcript p. 98.) The defendant, who was never hesitant to express his personal beliefs, responded: “I don’t think it’s agreeable, your honor.” The defendant then attempted to revive an earlier more lenient offer made by the Commonwealth made during pre-trial discovery. As can be seen from the foregoing, the defendant was attempting to determine what his sentencing options were. The Court then inquired of the Commonwealth if they would offer the earlier four to four and one-half sentence and the Commonwealth declined to honor that earlier offer. (Transcript pp. 98-99.) The defendant then explained to the judge that he understood that he might receive a harsher sentence after trial if all the charges against him were proven but he wished to explain to the court that a five to seven sentence “is like a life sentence to me, especially with probation.” (Transcript p. 99.) This judge then explained “look, there is no doubtl wouldn’t want to do five to seven. But, frankly you have too look at your options. Maybe you have some strong defenses. Maybe you don’t get convicted of these crimes. But if you get convicted, I think you’re talking about a sentence that is going to be far stiffer than five to seven. And I think that, then, really, a good chunk of your productive life will be taken away from you. Whereas five to seven gets you out, back on the street.” (Transcript p. 100.) To this, the defendant responded “well I would ask the court to consider the possibility of four to five.” The court responded “frankly I think five to seven is a very generous offer. I would not impose a sentence less than that.” (Transcript pp. 100-01.)
In this case, the judge did not threaten any particular sentence. Instead, the judge stated the obvious. If the defendant was to go to trial and was to be convicted of the numerous felony charges, he might well receive a significantly longer prison sentence than five to seven years incarceration. No particular sentence was promised. Certainly this is not a case where a judge threatens a maximum sentence if a defendant chose, to exercise his right to go to trial. Compare Commonwealth v. Carter, 50 Mass. App. 902 (2000). Instead, this side bar conference “did nothing more than crystalize several choices for [defendant Gaumond] which were intended to assist him in making an informed decision as to his plea. None of the choices imposed pressures beyond those normally affecting a defendant in his situation.” Commonwealth v. Damiano, 14 Mass. App. at 620 (unrecorded lobby conference deemed not coercive where judge stated that he “had an eighteen to twenty year sentence in mind if defendant cooperated” where defendant was facing potential life sentence).
After having obtained this information byway of the side bar conference, the defendant had time to assess his options. He decided to plead guilty. The guilty plea colloquy was extensive. There is simply no doubt the defendant’s plea was voluntary. He wished to gain credit by offering a plea of guilty instead of going to trial the next morning. He obtained a lenient sentencing recommendation which the judge assured him that he would impose. Having struck that beneficial bargain, and being aware that many of the witnesses who would have testified against him at trial are now even more elderly, the defendant has made the calculated decision to seek to withdraw his plea of guilty. Here the defendant initiated the plea negotiation process. He knew that he could fully exercise his right to a fair, public trial on the very next day. He also knew that the Commonwealth’s lenient sentencing recommendation, which took into account his acceptance of responsibility and the beneficial effect of relieving various elderly witnesses of the trauma of testifying, would disappear on the next day. (Transcript, pp. 101-03.) The defendant also recognized the reality voiced by the judge at the conference, namely that were he to go to trial, and if he would be to convicted of all the numerous felonies, he would, in all likelihood, receive some significantly longer sentence. Given the numerous charges, the alleged scheme, and the defendant’s past criminal record of similar offenses, this hardly could have been a surprise to such a knowledgeable and sophisticated defendant as Mr. Gaumond. Nor did it in any way constitute some sort of coercion that prevented him from asserting his right to a trial.
This motion must be DENIED.

 After the defendant was evaluated by Dr. David Swenson, this Court found that the defendant was fully capable of representing himself and standing trial. (Transcript, November 29, 1999, p. 67.) It was the defendant then who brought up the request of “possibly lobbying this case." (Transcript, p. 68.) He stated that he wished to speak with his stand-by counsel Mr. Bransfield about negotiating a plea. The Court allowed him time to do this. At the time, defendant Gaumond was aware that a co-defendant (Mr. Stephen Todd) was pleading guilty and the court would be conducting a plea colloquy with Mr. Todd.

 There are numerous other reasons why a judge's involvement in plea negotiations should be discouraged (or, as in the federal system, outright prohibited). These include the unavoidable fact that most lobby conferences are in essence “back room deals” that do not involve the defendant, the victim, or the public. No matter how fair a judge is in the lobby conference (be it in his or her lobby or at sidebar, be it on or off the record) it is usually only the judge and the lawyers participating. Any plea agreement negotiated in such a private setting is likely to be misunderstood by the public, the defendant, or the victim. In addition, the judge, no matter how wise or experienced, has only limited knowledge of the details of the case and he or she is being asked to give a snap decision as to what is an appropriate sentence. This places the judge in an untenable position. The often-used excuse for such a participation in plea bargaining is that the judge will only give a tentative decision as to the sentence during the lobby conference, but will await a full sentence hearing before announcing the final sentence. But, even if well intended, this is but an excuse. In reality, the “fix is in” after the judge has indicated an appropriate sentence and it is communicated to both sides, barring some truly surprising development during the plea colloquy or the victim impact statement. For all these reasons, this judge no longer participates in the practice of “lobbying” cases. Denying both sides of a criminal case the chance to expound upon their positions in such a lobby conference and to obtain a general sense from the judge whether he or she would accept the defendant’s sentence recommendation is not a popular position to take. Both defense counsel and the prosecutor often seek such a lobby conference. For example in this case, the sophisticated pro se defendant actively sought a lobby conference and this judge acceded to the request by holding a conference on the record at side bar. Given the inevitable disagreements that occur after a defendant has been sentenced, this judge, at least, has decided that the better practice is to avoid any involvement in the plea negotiation process. The current motion is sufficient evidence of why this Judge and a few of his colleagues have changed their positions on the issue of holding lobby conferences. It is worth noting that Superior Court judges who regularly sit in western Massachusetts do not engage in the practice of lobbying cases and no apparent ill effects have been observed from Springfield westward.